HAHN & CLAY, Plaintiff,

v.

A. O. SMITH CORPORATION, Defendant.

Civ. A. No. 12309.

United States District Court
S. D. Texas,
Houston Division.

May 21, 1962.

Hayden & Pravel, B. R. Pravel, Bobbitt & Evans, James F. Bobbitt, Houston, Tex., for plaintiff.

Vinson, Elkins, Weems & Searls, J. V. Martin and Alfred H. Evans, Houston, Tex., Porter, Johnson, Quale & Porter, I. W. Zirbel, Milwaukee, Wis., for defendant.

CONNALLY, Chief Judge.

Three causes of action are asserted here; first, for infringement of two patents; second, for unjust enrichment by reason of misappropriation of certain trade secrets; and third, by way of cross action, for wrongful interference with a contract, or with contractual negotiations. The posture of the case at the time of trial was such that A. O. Smith Corporation appeared as plaintiff, and Hahn & Clay, Lawrence F. Megow, and Raymond Pechacek as defendants. A. O. Smith Corporation ("Smith" hereafter) is a very large concern, with principal offices in Milwaukee, Wisconsin, and with offices and manufacturing facilities in various cities in the United States. Smith manufactures various items for industrial and domestic use[1]. Hahn and Clay is a much smaller concern engaged in steel fabrication, with its sole location in this city. Lawrence F. Megow and Raymond Pechacek are longtime former employees of Smith, who left Smith's employ about February 1, 1954 and immediately took employment with Hahn & Clay.

The controversy results from a dispute in connection with the manufacture of "multi-layer pressure vessels." Such vessel is a tank, or container, for the storage of liquids or gases confined under great internal pressures. A vessel, when made from a single sheet of steel, under some circumstances[2] will not withstand the pressures of which such steel potentially is capable. In those circumstances it has been found that a vessel constructed of many relatively thin layers of steel is more efficient than a solid wall vessel of equal weight and size. Additionally, many manufacturing advantages are afforded by working with the several thinner sheets rather than with the single, thick sheet. Such vessels are a specialty item in the trade, and almost uniformly are custom built to meet the needs of a particular customer. While of course such vessels may vary greatly in size and wall thickness, a typical vessel might be some 10 feet in length, some 36 inches in diameter, and with a wall thickness of perhaps 5½ inches. The wall of a vessel of this size well might be constructed using ½ inch steel plate for the initial, or inner, layer, with 20 additional sheets or "wraps," each of ¼ inch steel plate, individually wrapped around the earlier layers.

In the course of construction, the original sheet is rolled into the form of a cylinder, with open ends, and the longitudinal seam is welded. The first wrap is tightly pressed around the original cylinder and similarly welded in place. Then the successive wraps separately are tightly pressed against the earlier, and each is welded in place. With the cylinder thus built up to the desired wall thickness, the ends are machined and a cap, or head, is welded upon each end.

Smith was the originator of the multi-layer vessel. The dominant patent (No. 1,925,118 and referred to hereafter as "Stresau 118") dated September 5, 1933 was issued to R. Stresau, a Smith employee, and assigned to Smith. Smith spent large amounts of money before and during the life of this patent in experimentation and research looking toward development of a more efficient vessel and the most economical means of manufacturing same.

Under date of January 12, 1943, the Stresau reissue patent, No. 22,251 ("Stresau 251" or "Stresau Reissue" hereafter), was issued and assigned to Smith. The principal, if not sole, contribution of the reissue patent is the description of the use of "tension bands"

---

[1]. Various types of steel tanks for refining, brewing, and other purposes, pipe, pumps, hot water heaters, welding equipment, etc.

[2]. Where the ratio of diameter to wall thickness is in the neighborhood of 10 or less.

in the application of the several wraps, in fabricating the multi-layer pressure vessel. These tension bands, or straps, are wrapped circumferentially around the first wrap (and, successively, around the succeeding wraps) and pressed tightly against the original cylinder. One end of such straps is secured. To the other end great force is applied so that the wrap is squeezed very tightly around the original cylinder and the steel plates are thus brought into very close surface contact. While held tightly in position by the use of such bands, a short weld is applied to the edges of the wrap between the bands to prevent slippage when the pressure is released. When that particular point of contact is secured, the bands are released and the process repeated at intervals throughout the length of the cylinder. Thereafter additional wraps are applied in the same manner. Stresau 118 and Stresau 251 each expired September 4, 1950. Not only during the life of these patents but during the ensuing years, and until the events giving rise to this litigation, Smith enjoyed a monopoly in the manufacture of these vessels.

Megow was employed by Smith September 27, 1928 in their Milwaukee plant. At that time he signed the contract [3]

3. Omitting the "Statement by A. O. Smith Corporation to the Person Signing this Agreement," the contract in its entirety reads as follows:

"A. O. SMITH CORPORATION AGREEMENT.

"WHEREAS, the A. O. Smith Corporation proposes to employ me in a confidential relation and in such relation I may receive and have acccess to confidential information as to the plans, methods, processes and purposes of the corporation; and receive disclosures of conceptions had and inventions and improvements partially or wholly made by the officers or other employes of said corporation, and it is contemplated that I shall to the extent of my ability assist in improving and developing the said inventions, processes and methods of the said company.

"NOW THEREFORE, In consideration of my employment by A. O. Smith Corporation, I do hereby agree:

"1. To assist the corporation in all possible ways in the discovery, perfection and development of new inventions, devices, methods, and processes (including all patents and patentable improvements) all for the benefit of the corporation and as its exclusive property, compensation for all of which is hereby acknowledged to be included in the salary to be paid to me by said corporation as heretofore agreed upon.

"2. Not at any time to use independently of my work for the corporation or at any time to divulge to others information regarding any of the records, data, methods, processes and inventions owned, held or conceived on behalf of the corporation which would in any manner prejudice or jeopardize the best interests of the corporation.

"3. To offer to the corporation freely all possible suggestions for improvements or inventions along lines of business pursued by the corporation and promptly to disclose all conceptions, improvements and inventions to the officers of the corporation.

"4. At the expense and on demand of an officer of the corporation promptly to apply for letters patent for any and all patentable improvements, discoveries and inventions, and to assign the same and the patents to be issued therefor to the corporation.

"5. As a matter of record, I have given below a complete list of all inventions patented or unpatented, including a brief description thereof which I made or conceived prior to my employment, and I desire that these inventions shall be excluded from this agreement.

"6. I have read the above statement of the corporation and this agreement before signing my name hereto, and I understand that the above statement of the corporation is the only statement that I am entitled to rely upon in entering into this agreement and that I am not to accept as a part of this agreement or as a part of the statement of the corporation any statements or promises by any officer, agent or employe of the corporation except as expressly set forth above.

"The above agreement constitutes the whole agreement between myself and the A. O. Smith Corporation except only as to the amount of my salary which has been fixed by independent agreement.

"Dated at Milwaukee, Wisconsin 9-27-28.

/s/ Lawrence Megow.
Employe.

"In presence of:
"/s/ A. G. Kuelher
"/s/ Edgar Ryshke"

wherein he agreed, in part, not to divulge to others information regarding any of the "records, data, methods, processes and inventions" owned, held or conceived on behalf of Smith which would in any manner prejudice or jeopardize Smith's best interests. Megow spent several years doing "time study" work for Smith at their Milwaukee plant. By this is meant that he studied the number of man hours necessary to perform the various phases of the work in manufacturing the various Smith products. From the results of these studies certain charts were made which were of great benefit to Smith in bidding on future jobs. Megow was assigned increasingly responsible positions with Smith in Milwaukee until he was transferred to Smith's Houston plant, in 1947, where he assumed the position of plant superintendent. He later became plant manager and was in charge of all manufacturing operations of the company in Houston. Over the years, by reason of the responsible positions he held, Megow became thoroughly familiar with all of Smith's methods and techniques in the construction of multi-layer pressure vessels, as well as many other items. He had full access to all of Smith's information and "know-how," certainly during his Houston service, if not before. His position was one of trust and confidence.

Raymond Pechacek was employed by Smith in 1945 as a "design engineer" and later became a "product engineer." He remained in this capacity until his resignation in early 1954. He was in charge of product engineering in the Houston plant for several years prior to his resignation. He prepared drawings of the products to be manufactured by Smith, prepared lists of necessary materials, etc. For the last several years of his employment he worked directly under and for Megow. He also signed a secrecy contract in all respects similar to that of Megow.

Both Megow and Pechacek left Smith's employ because, having enjoyed residence in this city and state for a number of years, they did not desire to return to Milwaukee, on closing of Smith's Houston plant. While each took immediate employment with Hahn & Clay, they were not enticed away by the latter company with any improper motive or design to pilfer Smith's trade secrets. At Hahn & Clay, Megow has been chief engineer. Pechacek has performed the same character of work there that he did for Smith.

On June 23, 1958, Smith, Hahn & Clay, and some 500 other invitees received invitations to bid upon the first of two large government contracts, including the fabrication of a large number of multi-layer pressure vessels. The first contract was for the Warren Air Force Base at Cheyenne, Wyoming ("Cheyenne job" hereafter). While Hahn & Clay had never previously built a multi-layer pressure vessel, and while this job entailing a contract of approximately one and one-half million dollars was a very large single undertaking for that relatively small company, Hahn & Clay immediately undertook work to prepare a bid. Megow was in charge, and he and Pechacek spent considerable time estimating the labor and materials which would be required. Megow went to Cheyenne to consult with the other contracting parties, and was active in all negotiations connected with the Hahn & Clay bid. Ultimately, Smith was the low bidder and received the Cheyenne contract.

Very shortly following receipt of the Cheyenne invitation, the parties received a similar invitation to bid on the "Cooke job" for the construction of multi-layer pressure vessels at Cooke Air Force Base, near Los Angeles, California. Megow and Pechacek again worked on the bids; Megow made several trips to Los Angeles, during which time he consulted with engineers representing the prime contractor[4], the government, and others.

4. The prime contractor was a joint venture, composed of Manhattan Construction Company, Paul Hardeman, Inc., and Utah Construction Company.

He suggested many changes in the specifications, looking toward the more economical and efficient fabrication of the vessels; he assured all concerned that Hahn & Clay was able to construct these vessels, and he made no secret of the fact that he previously had been associated with A. O. Smith Corporation.

As a result of these negotiations it was contemplated or considered that Wall Cryogenics would take a subcontract under the prime contractor for the pressure vessels and various other equipment; and that Hahn & Clay would construct the pressure vessels under a sub-subcontract with Wall Cryogenics. While there was never a firm contract between Wall Cryogenics and the prime contractor, negotiations with Hahn & Clay reached the point where Wall Cryogenics forwarded a "purchase order" to Hahn & Clay. No contract was entered into, and a number of details remained in doubt, at the time that the alleged interference occurred as set out below.

On receiving the invitations to bid in June, 1958, Hahn & Clay wrote A. O. Smith inquiring if it were not true that their patent on multi-layer vessels had expired. Smith replied that while the original patent (Stresau 118) had expired, they owned other patents which well might be infringed, and called Hahn & Clay's attention to the fact that Megow had signed a secrecy agreement with them on his employment in 1928, and warned Hahn & Clay against any use through Megow of Smith's trade secrets in connection with the construction of such vessels. One of the Hahn & Clay executives journeyed to Milwaukee and discussed the matter with an executive of Smith. The conference did not resolve the differences between the companies.

On August 20, 1958, Smith, through H. F. Detrick, its vice president, sent a telegram to Hahn & Clay, with copies to Wall Cryogenics, Paul Hardeman, Inc., Utah Construction Company, U. S. Army Engineers, and Air Force Ballistic Missile Division[5], warning Hahn & Clay that Smith expected to take action to enjoin Megow from disclosing, and Hahn & Clay from utilizing, any Smith procedures in connection with the manufacture of multi-layer vessels. It is this telegram, with copies to the parties named, which Hahn & Clay charges constituted interference with their contract with Wall Cryogenics.

Neither Smith nor Hahn & Clay was awarded the Cooke job. Other types of containers were used in lieu of multi-layer vessels.

A few weeks later the present action was initiated by Hahn & Clay. The complaint, naming Smith as defendant, sought a declaratory judgment delineating just what Hahn & Clay could—and could not—do in the manufacture of multi-layer pressure vessels without infringing any Smith patents and without misappropriation of any Smith trade secrets, etc. After much preliminary skirmishing, by discovery procedures and otherwise, and after one or more extended conferences with counsel, the Court

5. "Hahn and Clay—
5100 Clinton Drive Hou—
1958 Aug 20 PM 4 21
"We understand that an order for multi layer construction cylinders for the Cooke Air Force Base has recently been issued to you by Wall Cryogenics. In my letter to you of August 15, 1958, I directed your attention the secrecy agreement dated September 27, 1928, between us and Lawrence Megow, who now is in your employ. We hasten to inform you, before you purchase equipment or materials to perform the order, that we intend to bring action to enjoin Megow from disclosing to you and to enjoin you from utilizing any of our methods and processes having to do with the manufacturer [sic] of multi layer vessels. Copies of this telegram are being sent to Wall Cryogenics, Paul Hardeman, Inc. Utah Construction Company, U. S. Army Engineers District at Los Angeles and the Air Force Ballistic Missile Division at Inglewood, California—
"H. F. Detrick Vice President—0104—
"A. O. SMITH CORP"

indicated his views to counsel that relief by declaratory judgment would not lie, in that a decree could not properly be drafted in the form which the plaintiff's complaint requested. The Court was prepared to dismiss the action. However, Hahn & Clay at this juncture entered into a contract for the construction of a multi-layer pressure vessel and did in fact construct one (the "Dynamic Research vessel"). As noted more in detail hereafter, this vessel was similar in many respects to the Smith type vessels. I am convinced that it was constructed by Hahn & Clay in part at least to bring the controversy to a head and to invite an infringement suit. With the probability of litigation in mind, Hahn & Clay took the following action. It employed an engineer of repute not in its regular employ to design a "wrapping machine" for use of the tension bands of Stresau 251. With certain information furnished by Hahn & Clay, and after some independent research, he did so. It appears to be in all important particulars similar to that used by Smith. In the actual fabrication of the Dynamic Research vessel, Hahn & Clay witnesses have testified that both Megow and Pechacek were completely divorced from any connection therewith, and that the vessel was fabricated in its entirety by one Zanders, the Hahn & Clay shop foreman. Zanders testified that he experienced little difficulty in following the plans and blueprints and in completing the vessel.

Following construction of the Dynamic Research vessel, Smith cross-acted in this proceeding and joined Megow and Pechacek as additional cross defendants. Smith asserts its claim for patent infringement and for misappropriation of trade secrets against these three. By agreement of all parties, Smith stands in the position of plaintiff. Hahn & Clay, by cross action, seeks to recover for alleged contract interference. The original action seeking declaratory relief is moot and is not pressed.

*The Patent Case (as to Jasper 2,480,369)*

All five claims of Jasper Patent 2,480,-369 ("Jasper 369" hereafter) are alleged by Smith to have been infringed in the construction of the Dynamic Research vessel.

It will be remembered that Stresau 118 taught that the several laminations should be in close surface contact with one another, and tightly drawn together. Stresau 251 illustrated the use of tensioning bands for this purpose. The contribution of Jasper 369 is in the method of "pre-stressing" such vessels.

Study and experimentation have disclosed that a vessel of this nature is most efficient when each wrap bears its share of the stress and pressure when the work load is applied. This is accomplished by reducing the space between the various wraps to an absolute minimum. This in turn is accomplished by a procedure known as "prestressing" the vessel. Jasper 369 teaches a new method of pre-stressing. Prior to Jasper 369, Smith followed the "auto-frettage," or Keplar, method of pre-stressing its vessels. In this method, after completion of the vessel, a relatively incompressible fluid is injected into the vessel under high pressure. The inner shell and the few adjacent layers are thus pressed outward against the confining outer layers, to a point beyond the normal elasticity of the steel. The inner layers take a "set" and do not contract to their original shape when this internal pressure is released. As a result, the several inner layers remain under compressive stress (that is, they are being compressed by the outer layers) and the outer layers remain under a tensile stress (that is, they exert a confining pressure on the inner layers).

The teaching of Jasper 369 is that the pre-stress may be applied to the vessel during the course of construction, thus avoiding the additional step required under the Kepler method. Proving his point by certain formulas incorporated therein, Jasper teaches that when each

wrap is applied, it may be tightened (by means of the tension bands) not only to an extent sufficient substantially to remove the voids which may be present between it and the previous layer, but additionally to an extent which will actually reduce the diameter of the partially completed structure. This will set up initial compressive stresses in the metal of the inner layers and initial tensile stresses in the metal of the outer layers. As the outer layers are applied, greater force is utilized than with the earlier layers. The net result of the foregoing is the placing of the first several layers, perhaps 6 or 8, under compressive stress and the remaining layers under tensile stress. This gives the highly desirable pre-stressed condition mentioned above. Reduced to its simplest form, it may be said that Kepler accomplished this result by blowing up or ballooning out the several inner layers against the confining outer layers after completion; Jasper accomplished it by compressing the inner layers during construction to such an extent that, on application of the outer layers, the same compression of the inner layers remained.

■ Hahn & Clay attacks the validity of Jasper 369 for several reasons. First, it is contended that it fails to inform the public of the limits of the monopoly asserted; second, it is contended that the claims of Jasper 369 overclaim the alleged invention; and thirdly, that there is a lack of invention over Stresau 251. While expressed in different language, each of these contentions, in simplest form, is reduced to this argument, which Hahn & Clay advances with much force. As the Stresau patents teach the use of tensioning bands in the application of great force to press the layer being applied tightly upon the cylinder previously formed, and teach that the layer must be brought into close surface contact with the layer beneath, it is argued that Jasper merely teaches, in 369, that additional pressure will result in the pre-stressed condition. As there is nothing in Stresau 251 stating how much pressure should be used upon the bands to bring the layers into close surface contact, and there is nothing in Jasper 369 stating how much pressure should be used in giving the pre-stressed condition, it is argued that the public, in the fabrication of such vessel pursuant to the Stresau method has no way of knowing when the force which is being applied reaches the limits of the Stresau patent and begins to infringe upon the Jasper patent. Further to support this argument, it is contended that when pressure is applied by the tensioning bands sufficient to bring the outer wrap in close surface contact, then some compression of the inner layers inevitably is effected. It is contended that Jasper does no more than to teach that additional pressure—and hence, greater compression—is desirable, without any method to determine when the outer limits of the Stresau method are reached, and when the minimal limits of Jasper may be transgressed. In support thereof, Hahn & Clay cites A. O. Smith Corporation v. Petroleum Iron Works, 6 Cir., 1934, 73 F.2d 531; Universal Oil Products Co. v. Globe Oil & Refining Co., 1944, 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399; Triumph Hosiery Mills, Inc. v. Alamance Industries, Inc., 4 Cir., 1962, 299 F.2d 793. While this question as to whether the disclosures of the patent are sufficiently certain and definite is not free of doubt, on mature consideration I have determined that the patent is not invalid by reason of this fact. The Jasper method undoubtedly constitutes an improvement over the Stresau patent and an improved alternative method to that of Kepler. It describes a method for the application of pressures sufficient to give a controlled pre-stressing of the vessel. As the amount of pressure necessary to bring the wraps into close surface contact, without affording appreciable or sufficient pre-stress (under the Stresau patent), would of necessity vary depending upon the thickness of the plate, the degree of smoothness thereof, and probably many other factors, it

would appear that no specific provision as to the amount of force to be applied would be possible, under the circumstances. On this issue of certainty, I am much influenced by the fact that the Examiner in the patent office allowed claims 1, 2 and 5 of Jasper 369, and disallowed claims 3 and 4. Claims 3 and 4 were allowed by the Board of Appeals, which decision was affirmed by the Court of Customs and Patent Appeals. (Guiberson Corporation v. Equipment Engineers, Inc., 5 Cir. 1958, 252 F.2d 431)

Hahn & Clay also contends that Jasper 369 was anticipated by certain publications of A. O. Smith and papers authored by Jasper prior thereto. I have examined the exhibits in question, and find to the contrary.

The patent, in my judgment, is valid.

■ I find that claims 1 through 5 inclusive of Jasper 369 were used by Hahn & Clay in the manufacture of the Dynamic Research vessel, and that these claims were infringed. The wrapping machine designed for Hahn & Clay was of sufficient capacity to put the inner layers in compression and the outer layers in tension, and this was done in the manufacture of the Dynamic Research vessel. Sufficient pressure was exerted in the use of the machine to accomplish this purpose, greater forces being employed in the application of the outer layers than was the case in the application of the earlier layers. The vessel was not pre-stressed in any other fashion.

As pointed out hereafter, Megow and Pechacek had little connection with fabrication of the Dynamic Research vessel, and the proof is not sufficient to convince me that they individually infringed.

*Jasper Patent 2,372,723*

■ Claims 6, 7 and 9 of Jasper Patent 2,372,723 are here in controversy. This patent likewise is concerned with an improvement in the stress distribution of multi-layer vessels. It describes two methods of accomplishing this end by stress relieving (to be distinguished from pre-stressing of the vessel, as discussed above). Stresses are set up in the steel when it is pressed into cylindrical form, and when it is welded. Relieving these initial stresses is desirable if the work load is to be properly distributed among the several layers on completion. The stress relieving operation is accomplished by heating, and then gradually cooling. Jasper 723 teaches that this may be done where a number of wraps have been applied and the partially constructed cylinder heat treated, as mentioned; or by another method where the single plate composing the inner shell alone is thus stress relieved.

I construe claim 6 as relating to the first form of Jasper 723, contemplating the stress relieving of the partially completed vessel where several wraps have been applied. This was not infringed in fabrication of the Dynamic Research vessel, as only the inner shell there was stress relieved.

Claims 7 and 9 relate to the second form, which specifies stress relieving of a single plate which is referred to as having "substantial thickness." Looking to the specifications to determine the meaning of the term "substantial thickness," reference is had there to a plate from one to one and one-half inches thick, and I construe claims 7 and 9 as referring only to use with plates of such thickness. The Dynamic Research vessel had its inner shell of one-half inch plate, and does not infringe claims 7 or 9 of Jasper 723.

There was no infringement of this patent.

*Hahn & Clay's Cause of Action for Interference With Contractual Negotiations*

■ Hahn & Clay may not recover upon the action which it asserts, first, because the facts do not bear out its contention that the Smith telegram of August 20 was the cause of its failure ultimately to arrive at a binding con-

tract, and secondly, because Smith was warranted in sending the telegram, and committed no legal wrong thereby.

On September 24, 1958, some 30 days after the Smith telegram, Hahn & Clay addressed a letter to Wall Cryogenics, Inc. which apparently it contemplated would constitute the terms of its sub-subcontract with that company (Plaintiff's Exhibit 15). Hahn & Clay imposed many onerous conditions therein, including the assignment by Wall Cryogenics to Hahn & Clay of the former's subcontract with the prime contractor in the full amount of the Hahn & Clay bid, to assure Hahn & Clay that it would receive partial payments from time to time to cover the materials which it purchased for the job. Additionally, Hahn & Clay demanded "an unconditional written guarantee" from the prime contractor that Hahn & Clay would be promptly reimbursed in full for all invoices covering materials purchased for the job. Additionally, Hahn & Clay required that Wall Cryogenics "agree to protect and indemnify us against any loss or damages that might result from delayed deliveries which arise from litigation heretofore threatened by A. O. Smith Corporation." This letter, with these conditions, was approved by Wall Cryogenics September 24, 1958. However, five days later this company dispatched a telegram to Hahn & Clay stating: "Your request for Utah (the prime contractor) signature denied and is cause for cancellation of our subcontract."

The contents of these messages show conclusively that Hahn & Clay's loss of the contract resulted from a failure of the contracting parties to agree upon mutually acceptable terms, and I so find.

The Smith telegram of August 20 was no idle threat. While undoubtedly the transmittal of same was motivated by self interest on Smith's part, the cause of action which it mentioned was not frivolous nor asserted maliciously, as is reflected by these proceedings. It did no more than tell the truth. As a result thereof, no cause of action arose in Hahn & Clay's favor. (Bryan v. Sid W. Richardson, Inc., 5 Cir., 1958, 254 F.2d 191)

### Smith's Cause for Misappropriation of Trade Secrets and Unjust Enrichment

Smith contends that there has been a violation of the secrecy contracts which Megow and Pechacek signed at the time of their employment (1928 and 1945, respectively), and that Megow and Pechacek have violated a confidential relationship by disclosing its trade secrets to Hahn & Clay, for which equity will give relief.

I find that the contracts in fact were executed as Smith contends, and that they are valid and enforceable. (A. O. Smith Corporation v. Petroleum Iron Works, 6 Cir., 1934, 73 F.2d 531; Hyde Corporation v. Huffines, 158 Tex. 566, 314 S.W.2d 763; Welex Jet Services, Inc. v. Owen, Tex.Civ.App., 325 S.W.2d 856) As stated earlier, I find that Megow enjoyed a position of trust and confidence with Smith during his employment, and had access to all of its trade secrets and technical know-how. While Pechacek's position was not upon the level of Megow's, he, too, had access to much of that company's confidential information, and was not justified in using it in a manner inimical to Smith's interest.

But it is not every shop practice, routine, or short cut, to which the law gives the rigorous protection which Smith seeks here. An employee may use the increased efficiency and skills acquired while working for an earlier employer, if he takes with him nothing more. (Welex Jet Services, Inc. v. Owen, Tex.Civ.App., 325 S.W.2d 856, and authorities there cited; Sarkes Tarzian, Inc. v. Audio Devices, Inc., 9 Cir., 1960, 283 F.2d 695)

After most careful consideration I have determined that the work of Megow and Pechacek upon the Cheyenne and Cooke jobs (prior to Smith's warning letter of August 15, 1958, and the later construction of the Dynamic Re-

search vessel) amounted to no more than this, and did not constitute a violation of the contract.

Their work in this connection consisted of preliminary planning. They calculated the amount and the size of the steel sheets to be purchased; they estimated the man hours required in the several operations to be performed; they planned production schedules to meet delivery dates; and undertook to convince the other interested parties of their own competence. In gauging whether activities of this nature violated the contractual terms, or constituted a wrongful disclosure of confidential information, it must be remembered that during their employ at Smith, work upon multi-layer vessels was not treated as any more secret or confidential than work upon the myriad of other products of the A. O. Smith Corporation. It was routine. The wrapping machine and vessels in the course of construction frequently were shown to visiting groups, and much of the manufacturing data was publicized by Smith in its advertising brochures, bulletins, and technical papers delivered to trade or professional groups. By his time study work at Smith, Megow no doubt became able accurately to calculate how much steel and how many hours of time were required to perform many shop operations. He could carry that skill with him to his new employ without violation of any confidence to Smith.

The terms "methods" and "processes," as used in the secrecy agreement must be construed to mean only those that are secret or confidential, for the contract was not designed to prevent an employee from using Smith methods if those methods were of common knowledge throughout the trade. While undoubtedly Megow and Pechacek learned the general methods to be followed in fabricating a multi-layer vessel while employed at Smith and made full use of this knowledge in work on the Cooke and Cheyenne bids, I find that these methods were not so unusual or unique, so secret or confidential, as to be within terms

of the contract or to constitute a trade secret which the law would protect as a confidential disclosure under the circumstances prevailing in July, 1958. Particularly is this true as the parties had no knowledge of Smith's claim to the contrary until August 15, 1958.

Smith relies principally upon Hyde Corporation v. Huffines, 158 Tex. 566, 314 S.W.2d 763, and K & G Oil Tool and Service Company v. G & G Fishing Tool Service, 158 Tex. 594, 314 S.W.2d 782, two able and exhaustive opinions by the Supreme Court of Texas, decided upon the same date, which clearly enunciate the law of this state. They are distinguished from the case at bar upon the facts; namely, that there was no bad faith present here, and that such disclosures as were made were not sufficiently secret or confidential as to be entitled to protection as a contract violation, or in equity.

### Construction of the Dynamic Research Vessel

At the time that Hahn & Clay entered into the contract for construction of the Dynamic Research vessel (in early 1959), that company had full notice of Smith's claims; this action was in progress; and if Hahn & Clay imitated any of Smith's procedures or processes, no longer could the claim of good faith be made. It is in the area of construction details—such as the sequence of the several manufacturing operations, the type of weld scarf, size and location of leak indicator holes—rather than the planning, estimating type of activity wherein Smith well may have secrets entitled to protection against the disclosure by former employees. Prior to trial Hahn & Clay was required to furnish Smith a list of the manufacturing processes which it followed in fabricating the Dynamic Research vessel. During the trial Smith undertook to show that there was such similarity between many of these and Smith's own practices as to show conclusively that Megow and Pechacek had divulged these matters to Hahn &

Clay. This, despite the testimony of the Hahn & Clay witnesses that Megow and Pechacek had been withdrawn from any work on the Dynamic Research vessel, though it cannot be denied that they had many discussions with their fellow employees about construction methods, while working on the Cheyenne and Cooke bids.

At the Court's request, Smith's counsel has set out in the brief the Smith manufacturing practices which it is contended were misappropriated, and followed by Hahn & Clay. I have examined these many points individually. In a number of particulars I find the similarity is not so great as to suggest imitation; in some respects there is similarity in matters of trifling consequence; and in other instances the similarities are no more than normally would result in the fabrication of the same type structure in different shops, and hence do not suggest conscious imitation. I find that Smith has not shown, by a preponderance of the evidence, the misappropriation of any of its trade secrets in the construction of the Dynamic Research vessel.

This finding is made despite the fact that Megow—and to a lesser extent, Pechacek—was a completely unconvincing witness. Megow's testimony was wanting in candor, and, in my judgment, in several instances, in integrity [6].

I accept as credible, however, substantially all of the testimony of certain other Hahn & Clay witnesses, including one or more former Smith employees, whose testimony clearly supports the foregoing findings.

From the foregoing it follows that Smith is entitled to recover for infringement of its patent Jasper 2,480,369. All other relief is denied. The foregoing is adopted as Findings of Fact and Conclusions of Law.

6. For example, (a) the evidence shows without dispute that Smith maintained a "technical standards book" wherein much of its highly confidential information, know-how and manufacturing processes from time to time were entered. Copies were distributed to its higher echelon engineers only, and a careful record was kept of this distribution. Such volume had been issued to Megow, and undoubtedly he used it frequently in his work with Smith. On being questioned about such volume, he professed to have uncertainty in his mind about it, and asked that such volume be offered to him for examination. When it was made to appear that no such volume was available in Houston, he denied even knowing what the "technical standards book" was, and (b) a page from the Houston standards book shows that the shop was directed to weld certain "1146–type" steel with an "SW–120" weld rod, a fact which Megow at the time of trial desired not to know. This entry in the Houston standards books was prepared in November, 1953 by a person with the initials "L.M." Without any explanation as to who else "L.M." might be, Megow denied any knowledge that such weld rod was proper for use with such steel.