DYNAMICS RESEARCH CORPORATION *vs.* THE ANALYTIC
SCIENCES CORPORATION & another.

Middlesex.    December 15, 1978. — February 27, 1980.

Present: GOODMAN, GRANT, & ARMSTRONG, JJ.

*Practice, Civil,* Master: report of evidence, recommittal. *Trade Secret.*
*Contract,* Employment. *Unfair Competition.*

Designated portions of the transcript of the evidence before a master
and the exhibits were properly before this court where a judge of the
Superior Court, in the exercise of his discretion, had ordered that the
evidence be filed for perusal by the court. [259-260]

In an action by a corporation to enjoin the defendants, including a for-
mer employee of the corporation, from using for their own benefit trade
secrets and confidential information of the plaintiff, the plaintiff failed
to satisfy its burden of proving that the allegedly unique characteristics
of its proprietary system were either secret or appropriated. [267-276]

In an action seeking to enjoin the use of trade secrets by a former em-
ployee of the plaintiff, a nondisclosure agreement which the defendant
signed on entering the plaintiff's employ did not, in the circumstances,
put the employee on notice that the obvious notions incorporated in a
proprietary system with which the employee was working were trade
secrets. [277-278]

In an action which was tried before a master and in which the plaintiff
failed to introduce any evidence upon which the master could make an
award of actual damages, the judge did not err in refusing to order a
further hearing on the question of damages where the plaintiff's af-
fidavit in support of its motion for a new hearing contained no infor-
mation upon which damages might be based. [279-281]

BILL IN EQUITY filed in the Superior Court on June 13,
1972.

The suit was heard by *Murphy,* J., a District Court judge
sitting under statutory authority, on a master's report.

*John M. Reed (Roger D. Matthews* with him) for the
plaintiff.

*Thomas R. Murtagh* (*Bertram E. Snyder* with him) for the defendants.

GOODMAN, J.  The plaintiff, Dynamics Research Corporation (DRC), brought this action against the defendant Robert Bicknell, formerly employed by the plaintiff, and the defendant The Analytic Sciences Corporation (Analytic), by whom Bicknell was hired after he resigned from the plaintiff.  The plaintiff sought to enjoin the defendants from "using for their own benefit the proprietary system of plaintiff known as TIRAS [an acronym for 'technical information retrieval and analysis system'] and from interfering with business relationships between plaintiff and customers of plaintiff with respect to projects in which defendant Bicknell took part during his employment by plaintiff."  The plaintiff also sought "such damages as the Court determines plaintiff has sustained by virtue of defendants' unfair competition."  (The complaint includes a general prayer "[f]or such other and further relief as may be appropriate.")

Preliminary relief was denied, and the case was referred to a master on June 30, 1972.  There were seventeen days of evidentiary hearings ending on January 29, 1973 (a stenographer had been appointed pursuant to G. L. c. 221, § 91C), and the master heard oral argument and received briefs on April 11, 1973.  On November 21, 1973, the master at his own request heard reargument of the case and on August 8, 1974,[1] forwarded his draft report.  The final report was filed on April 9, 1975.  The master concluded that "the structure and function of the TIRAS system is a trade secret" and "that both [defendants] intentionally and knowingly used trade secrets and other confidential information of the [plaintiff] to the benefit of the [defendants] and the damage of the [plaintiff]."  He also assessed damages for "unfair competition" against Bicknell in the amount of $15,000 and against Analytic in the amount of $30,000.

---

[1] By that time the new rules of civil procedure were in effect and governed proceedings thereafter.  Mass.R.Civ.P. 1A, par. 5, 365 Mass. 732 (1974).  *Jones* v. *Wayland*, 374 Mass. 249, 255 n.5 (1978).

The defendants filed objections to the master's report challenging his conclusions as unsupported by subsidiary findings and challenging various subsidiary findings as unsupported by the evidence. They moved to recommit the report so that the master might make findings specifically describing the "secret features of the 'structure and function of TIRAS'" and specifically setting out the factual basis for the various elements legally necessary for entitlement to protection as a trade secret, which were matters not addressed in the master's report. They also asked that the master make subsidiary findings on the question of damages. In addition, the motion to recommit asked for summaries of the evidence material to the requested findings and to certain of the original findings. See Rule 49(7) of the Superior Court (1974). The motion was accompanied by an affidavit of counsel, setting out suggested summaries of the evidence. The plaintiff moved that the master's report be confirmed and adopted.

By order entered May 12, 1975, a judge denied the plaintiff's motion and recommitted the report to the master. His accompanying order set out in detail, substantially as requested by the defendants, the matters on which the master was to make specific findings and summaries of the evidence. About a year later, on April 27, 1976, the master filed "Additional Subsidiary Findings" which purported to contain summaries of the evidence as requested by the judge's order. The master's findings with reference to the elements of the alleged trade secret will be discussed at a later point in this opinion; he made no findings as to damages, stating that "the finding made by the Master in his Report should be vacated in favor of a new hearing."[2]

---

[2] He then stated: "[A] further hearing on the question of damages was held . . . and re-argument was heard especially on the question of damages. After weighing the re-argument and the evidence from the original proceeding, the Master is convinced that a further hearing should be held before a new Master on the question of damages or a finding of one dollar ($1.00) be made in accordance with a further order of the Court. The Master is satisfied that the finding of all of the damages asked by the Plaintiff cannot be supported by the evidence offered . . . ."

The plaintiff moved that the master's report as supplemented by his "Additional Subsidiary Findings" be confirmed and that the court order a further hearing on the issue of damages as suggested by the master. In support of its request for a further hearing on the issue of damages, the plaintiff's counsel filed an additional affidavit setting forth the evidence before the master which, he contended, supported a finding of at least some damages against the defendants. The defendants filed objections to the additional subsidiary findings and to the "attempted summaries" of the evidence which the master had made. They moved that portions of the original report and the additional subsidiary findings be struck, that no further hearing be held on the question of damages, and that judgment be entered dismissing the action. The defendants alleged that the subsidiary findings did not support the master's ultimate conclusion and emphasized that "the Master did not provide brief, accurate and fair summaries of the evidence as required by the order so as to allow the Court to determine whether his findings were adequately supported by the evidence." The defendants in their motion suggested that "[i]f the Master has not been able to justify such findings in more than three years then it is time for the Court to conclude that there is little or no chance that the Master will be able to do so in the future." Accordingly, they requested "that the Court should review the evidentiary record itself and conclude that the Master's findings cannot be supported . . . ." The defendants also made a "Motion in the Alternative to Recommit Master's Report" for the making of additional findings of fact and for the making of proper summaries of evidence. Their motions were supported by an affidavit of their counsel purporting to show what would be proper summaries of the evidence, and they filed a motion that the judge make an express finding as to the truth or falsity of statements in the affidavit. Counsel for the plaintiff filed a counter-affidavit, setting out further summaries of the evidence.

The judge filed a "Memorandum and Order" in which he held that, except as to damages, the original and additional

supplementary findings "are not clearly erroneous and are confirmed and adopted." The court allowed the defendants' motion that the court make an express finding as to the truth or falsity of statements by the defendants' attorneys in their affidavit and found that "the statements as set forth in their [defendants' counsels'] affidavits, as supplemented by the plaintiff's counter-affidavits are true and accurate." He treated the defendants' motion to recommit "as waived" and ordered that the original transcript and exhibits be filed with the court. The judge further ruled that there should not be a hearing before another master or the court on the issue of damages[3] and that, "[t]here being a failure of proof of that part of the action seeking tort damages, the defendants are entitled to a finding on damages. Nominal damages would be appropriate if that part of the action sounded in contract." See note 2, *supra.* The judge, however, ordered a further hearing on the issue of injunctive relief.

Such a hearing was held before another judge on February 7, 1977. As set out in his memorandum accompanying the judgment, the plaintiff sought an injunction in the language set out in the margin.[4] At the hearing, neither party offered evidence, and "[a]rgument was had solely on the record, particularly the Master's Original Report and Additional Subsidiary Findings." On February 22, 1977,

---

[3] He observed that a further hearing before the same master was not practical "inasmuch as he has become a 'full time' district court judge."

[4] "That the defendants, The Analytic Sciences Corporation and Robert S. Bicknell, are for a period of two years from the date hereof, restrained and enjoined from using or disclosing to others and from selling or offering for sale plaintiff's TIRAS system or any similar management information system applied to high-value military equipment having as characteristics (a) the technique of pulling out and collecting a detailed life history of the object, such as a gyroscope or accelerometer, (b) the use of threaded lists or files to build a system in real time consisting of an inertial measurement unit or a piece of machinery, and/or (c) a characteristic in contrast to other management information systems where data may be stored, retrieved and/or reported, by which TIRAS is designed to feed back into the project activity and influence it and thus act as a forcing function."

judgment was entered denying both injunctive relief and damages. The plaintiff appealed.[5]

1. Before proceeding to the merits we must consider whether the designated portions of the transcript of the evidence before the master reproduced in the record appendix and the exhibits are properly before us. An order that the master file the evidence for perusal by the court is rarely made; such a practice ordinarily defeats the main objective of referring a case to a master. *Peters* v. *Wallach,* 366 Mass. 622, 626 (1975), and cases cited. *Jet Spray Cooler, Inc.* v. *Crampton,* 377 Mass. 159, 161 n.4 (1979). See the full discussion in *Michelson* v. *Aronson,* 4 Mass. App. Ct. 182, 184-187 (1976), and *Covich* v. *Chambers,* 8 Mass. App. Ct. 740, 741-743 (1979). Nevertheless, even when the original order of reference to a master provides that the master not report the evidence, the judge may subsequently order that the evidence be reported "if satisfied that in the interests of justice the evidence should be brought before him." *Shelburne Shirt Co.* v. *Singer,* 322 Mass. 262, 265 (1948), and cases cited. *Spiegel* v. *Beacon Participations, Inc.,* 297 Mass. 398, 406-407 (1937). *Jet Spray Cooler, Inc.* v. *Crampton,* 377 Mass. at 162 n.4 (last par.). *USM Corp.* v. *Marson Fastener Corp.,* 379 Mass. 90, 105 n.17 (last par.) (1979). Greaney, Trials Before Masters A Procedural and Substantive Primer for the Practicing Lawyer, 63 Mass. L. Rev. 195, 204 (1978). See *Goldberg* v. *Goldberg,* 7 Mass. App. Ct. 831, 835 n.3 (1979). Cf. *Shaw* v. *United Cape Cod Cranberry Co.,* 332 Mass. 675, 679-680 (1955); *Michelson* v. *Aronson,* 4 Mass. App. Ct. at 186; *Covich* v. *Chambers,* 8 Mass. App. Ct. at 742 — cases in which the existence of discretion was confirmed though the discretion was not exercised. The present case is one of the rare cases in which it

[5] The defendants also filed a "Notice of Cross Appeal From Memorandum and Order Entered February 1, 1977." An appeal from the final judgment in their favor is unnecessary to their attack on the master's report and "Additional Subsidiary Findings," such an attack being a way of supporting the judgment, though on grounds somewhat different from those adduced by the judge.

appears that the judge, in the exercise of his discretion (*Minot* v. *Minot*, 319 Mass. 253, 258 [1946]), ordered that the evidence be filed for his perusal.

The affidavits of both the defendants' and the plaintiff's counsel, which the judge found to be true (*Minot* v. *Minot*, 319 Mass. at 261), at minimum raise a serious question whether the master's summaries of the evidence on the trade secret issues were so meager as to require recommittal. *Boston Edison Co., petitioner*, 341 Mass. 86, 92 (1960). *H. Piken & Co.* v. *Planet Constr. Corp.*, 3 Mass. App. Ct. 246, 249 (1975), citing *Boston Consol. Gas Co.* v. *Department of Pub. Util.*, 327 Mass. 103, 106 (1951). The judge was also faced with the question of recommittal for further hearings on the matter of damages. In the present case a recommittal to the master for these purposes was, as the judge found, impracticable since the master had become a full-time District Court judge (see note 3, *supra*). In addition, as alluded to by the defendants in their motion to strike portions of the master's report, the proceedings before the master had already consumed approximately four years. In these circumstances the judge apparently accepted the defendants' suggestion in their motion to strike that he himself review the evidence before the master, and he ordered that the transcript of the evidence before the master and the exhibits be filed with the court. In this posture, he was enabled to treat as waived the defendants' alternative motion to recommit for the purpose of appending proper summaries of the evidence, which he otherwise would have been required to allow or deny.

Accordingly, we view the master's report in the light of the evidence before us and decide the case according to our own judgment, giving due weight to the findings of the master, which are not to be reversed unless they are clearly erroneous. *Goodell* v. *Goodell*, 173 Mass. 140, 146-147 (1899). *Shelburne Shirt Co.* v. *Singer*, 322 Mass. 262, 265-266 (1948). *Kuklinska* v. *Planning Bd. of Wakefield*, 357 Mass. 123, 127 (1970). *Jones* v. *Wayland*, 374 Mass, 249, 254-255 (1978). See *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. at 407.

2. We summarize the factual background, taken primarily from the master's findings, supplemented by the transcript and exhibits before us to the extent that they illumine the master's findings. The plaintiff was organized in 1955. Since about 1960 a part of its business has been with the Department of Defense and government agencies engaged in space exploration programs in connection with their development and operation of various highly sophisticated and complex instruments and instrument systems — primarily the inertial guidance and navigation systems[6] of various missiles, submarines, and military aircraft. The plaintiff contracts to assist a special projects office or other body (the customer) in charge of the development and operation of such instruments in making engineering and other decisions by providing it with relevant information and advice based on that information. This service, which the plaintiff performs under the trademark TIRAS, falls within the category (as characterized by the master) of "[d]ecision-supporting management information systems." Its purpose is to gather data which will aid the customer in answering questions and solving problems anticipated and unanticipated.

Initially, in undertaking to service a customer's project the plaintiff, through its program manager, establishes with the customer "the basic program requirements."[7] The matters of concern to the customer managing a particular

---

[6] A guidance system in this context is that portion of a missile or aircraft which controls the direction of its motion, and an "inertial" guidance system is one that maintains such control without human intervention by means of inertial instruments; very high precision instruments, gyroscopes and accelerometers are used for this purpose.

[7] This was described by one Stauffer, the manager of the TIRAS department for the plaintiff, as follows: "This activity involves a liaison between the Program Manager and representatives of the customer. At that time he establishes officially what the schedule for routine reports will be. He will establish how deeply into the instrumentation we are going to go. He will establish the content of the report or the regular reports. He will identify any analysis work which is to be done on a scheduled basis different from the routine reports. And he will establish where such is necessary what additional information may be required from the vendors

project generally involve information in at least four categories: Information as to how and the frequency with which the instrument being followed and its component parts break down or require repairs and the time it takes to make the repairs (reliability and maintainability information); information as to the reason the instrument broke down (failure analysis); information as to the status (e.g., whether a part is operable) and location of each component part (logistics information), and information as to how well each instrument is meeting its design goals (performance information). This information may be displayed in tabular form or on graphs and is included in routine reports, usually made monthly or bi-monthly to the customer and perhaps to the manufacturer and others involved in the development or operation of the instrument being followed. The information in these reports is used by the customer and others in making decisions concerning the instruments, including, for example, decisions as to their design and as to the requirements for spare parts. In addition, the routine reports serve to keep all who are involved in the development or operation of the instruments informed as to what is being done and what their problems are.

Further, at irregular intervals and at the request of the customer, a manufacturer, or other involved person, or on its own initiative, the plaintiff writes a special report making recommendations as to the solution of problems which have developed with respect to an instrument. For example, if a particular component part has a high rate of failure, the plaintiff may investigate the reason why and recommend a change in its design. Or, after the design of a particular component has been changed, the plaintiff might write a special report analyzing whether the instruments

---

and manufacturers; that is, other contractors working for the same customer."

"Analysis work" as here used by the witness appears to refer (as put by the master) to "the mathematical treatment of subjects through differential and integral and other types of equations." It does not involve data collection, but computers may be used in the solution of the equations.

containing the redesigned component worked better than those containing the component as originally designed. The plaintiff may also recommend, on the basis of how often a particular component part may be expected to fail, how many spares of that part should be kept on hand at repair facilities.

The data which may be needed as a basis for the reports or otherwise to inform the customer are collected from the manufacturers of the various component parts of the instruments, from those who assemble the system, from the users or operators of the instruments, and from those to whom the instruments are sent for repair. So called data technicians and engineering assistants employed by the plaintiff, who are generally high school graduates, check the data for consistency, completeness, and accuracy; they then code each piece of information, using a standard set of codes which is developed for each TIRAS project. The data are compiled and stored, usually on magnetic tapes or discs, for use in the plaintiff's computer. Computer programs are developed to instruct the computer to perform various operations on such data compilations (the files which compose the data base) so as to generate the data for the reports and for the solution of special problems.

Each project is managed by an engineer who is knowledgeable about the instruments being followed by that project. One to four other engineers may also work on the project. These engineers play key roles. The project manager, together with the customer, establishes the "basic program requirements" (see n.7), and he or such other engineers as are assigned to the project in consultation with the customer, the manufacturers and the vendors determine what data are available and how reliable they are, predict the data likely to be needed in analyzing problems which may arise with the instrument being followed during its development and operation, and on this basis decide what data are to be collected. They instruct the data technicians and engineering assistants how to determine the completeness and correctness of data sent to the plaintiff by the data

sources. Further, and most importantly, it is the engineers who write the reports and make the recommendations which are the ultimate product of the information service.

The defendant Bicknell came to know the plaintiff and its work after 1963, the year he joined the technical staff of the C. Starr Draper (Instrumentation) Laboratory of MIT as an inertial guidance engineer. Bicknell had graduated from the Naval Academy in 1953, after which he had joined the Air Force. In 1960, while in the Air Force, he received graduate degrees from the University of Michigan in Instrumentation Engineering and in Aeronautical and Astronautical Engineering. Among his Air Force assignments was a position in the guidance and control directorate of the ballistic systems division of the Air Force Systems Command, in which he had responsibility for over-all management and administration of the Titan II inertial guidance program. His resume, included by the plaintiff in a presentation to the Air Force while he was an employee, states, "He was awarded the Air Force Commendation Medal for exploitation of novel techniques for guidance system improvement . . . ." At the Instrumentation Laboratory, he continued to work with the development of advanced inertial guidance systems for advanced missile applications[8] and eventually became an assistant director of the Laboratory. The master found: "While at MIT, Mr. Bicknell helped evaluate DRC's management information system in an effort to convince the Air Force to use DRC's services. He attended a conference with DRC representatives. He was briefed by DRC. He was hired [in October, 1967] by DRC in part because he understood its management system concept."

_____

[8] That same resume states that at the Instrumentation Laboratory "[h]is responsibilities included management of activities supporting fabrication of the inertial measurement units such as maintaining control of all design documentation, establishing and monitoring interface controls for the inertial instruments and test support equipment, and establishing the criteria and monitoring performance for the reliability program. He supervised the design of specifications for all test computer programs."

During 1967 and 1968 Bicknell's primary responsibility was in marketing TIRAS. (Bicknell developed the acronym in 1969.) In May, 1969, he became the manager of the plaintiff's TIRAS department. But by 1971 he had become increasingly dissatisfied. He felt that the plaintiff was not giving the TIRAS department enough financial support fully to develop the TIRAS service. He was unhappy with his own salary. He had disagreements with other employees of the plaintiff, including the head of the plaintiff's computer department. At the end of December Bicknell resigned from DRC and accepted Analytic's offer of employment. Analytic had been founded in 1966 by former employees of the plaintiff and had extensive experience in the analysis (see note 7, *supra*) of problems arising in inertial guidance systems and in information processing. In January of 1970 it had considered the possibility of expanding its business to include management information service.

The immediate circumstances of Bicknell's change in jobs are set out by the master: "In November of 1971, Mr. Bicknell received a telephone call from [Analytic] asking for references concerning . . . a former DRC employee, [Analytic] was interviewing. Mr. Bicknell indicated generally his unhappiness at DRC. Discussions with [Analytic] followed. . . . DRC had considered discharging Mr. Bicknell in March of 1970, and when Bicknell submitted his resignation on December 27, 1971, no effort was made to get him to reconsider. He told Mr. Anderegg [the president of DRC] that he was going to work for [Analytic] and compete. Mr. Anderegg indicated that he hoped that wouldn't happen. There was no debriefing. There were no discussions between Bicknell and [Analytic] of specific DRC projects prior to the employment by [Analytic] of Bicknell. Mr. Bicknell made up his mind to accept [Analytic's] offer after his letter of resignation was so readily accepted notwithstanding the fact that he had already made a partial decision to go to [Analytic]." The master further found that at the time Bicknell left he had various documents in his desk and at home and that he took with him from DRC at least sixty

documents characterized in the plaintiff's brief as "marketing information" and including a forecast of the plaintiff's 1972 receipts and sales which listed the plaintiff's customers and potential customers for that year.[9]

At Analytic, Bicknell familiarized himself with its capabilities and its employees as the first step in developing a management information service in competition with the plaintiff. He began work on a proposal to perform such a service with respect to certain instruments in the Short Range Attack Missile (SRAM), including its inertial guidance system.

On February 18, 1972, the plaintiff submitted an unsolicited proposal[10] to perform its service with respect to SRAM. The plaintiff thus hoped to obtain a contract by negotiation (see part 3 of the Armed Service Procurement Regulation [ASPR], 32 C.F.R. §§ 3.100 et seq. [1972]) under the authority of 10 U.S.C. § 2304(a) (10) (1970)[11] rather than by competitive bidding (see part 2 of the ASPR, 32 C.F.R. §§ 2.000 et seq. [1972]). On May 8, 1972, Analytic submitted a formal unsolicited proposal to the special projects officer for SRAM to perform a management information service which it called MIDAR, an acronym for "Manage-

---

[9] The customers for 1972 were listed in three categories: customers with whom the plaintiff already had contracts, potential customers from whom the plaintiff believed it had a high probability of obtaining contracts, and potential customers from whom the plaintiff believed it had a low probability of obtaining contracts. The forecast also listed the gross payments which the plaintiff expected to receive from each customer during 1972 if contracts were obtained.

[10] Section 4.101(c) of the Armed Service Procurement Regulation (32 C.F.R. § 4.101[c][1972]) defines "unsolicited proposal" as "a research or development proposal which is made to the Government by a prospective contractor without prior formal or informal solicitation from a purchasing activity."

[11] Section 2304(a) (10) provides: "[T]he head of an agency . . . may negotiate . . . a purchase or contract, if . . . (10) the purchase or contract is for property or services for which it is impracticable to obtain competition." See ASPR, 32 C.F.R. § 3.210-2(a). See also ASPR, 32 C.F.R. § 1.201-11, and 1B McBride and Touhey, Government Contracts § 9.120 (1978).

ment Information based on Data, Analysis, and Reporting." On June 13, 1972, the plaintiff brought this action. Its claim is twofold: (a) that the "TIRAS methodology" is a trade secret protectable by an injunction and (b) that it is entitled to damages for unfair competition arising out of Bicknell's appropriation of marketing information characterized by the master as "competitively sensitive." We discuss these claims in turn.

3. *Trade secret protection.* We start with the "well settled [rule] that an employee upon terminating his employment may carry away and use the general skill or knowledge acquired during the course of the employment." *Junker* v. *Plummer,* 320 Mass. 76, 79 (1946). *Jet Spray Cooler, Inc.* v. *Crampton,* 361 Mass. 835, 839 (1972). *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc.,* 372 Mass. 835, 842 (1977). See *Richmond Bros.* v. *Westinghouse Broadcasting Co.,* 357 Mass. 106, 111 (1970). The "right [of an employee] to use [his] general knowledge, experience, memory and skill" (*J.T. Healy & Son* v. *James A. Murphy & Son,* 357 Mass. 728, 740 [1970]), promotes the public interest in labor mobility and the employee's freedom to practice his profession and in mitigating monopoly. The law thus maximizes the benefit of the national store of skill and knowledge. See *Club Aluminum Co.* v. *Young,* 263 Mass. 223, 225-227 (1928); *National Hearing Aid Centers, Inc.* v. *Avers,* 2 Mass. App. Ct. 285, 292-293 (1974). See generally Comment, Industrial Secrets and the Skilled Employee, 38 N.Y.U.L. Rev. 324 (1963); Turner, Trade Secrets 160-172 (1962).

This starting point is particularly appropriate in this case for, as set out above (see note 8, *supra,* and related text), Bicknell, an inertial guidance engineer, came to his job at DRC with knowledge and skill in the plaintiff's area of operation; and, as the master found, "was hired by DRC in part because he understood its management system concept." This case is thus different from *Junker* v. *Plummer,* 320 Mass. at 78, in which the court recognized the principle quoted above but emphasized (among the factors which im-

pelled it to protect the plaintiff's machine as a trade secret) that the defendants had never seen a machine that in any way resembled the plaintiff's before coming to work for the plaintiff. The court distinguished *New Method Die & Cut-Out Co.* v. *Milton Bradley Co.*, 289 Mass. 277 (1935) (which our case resembles), pointing out that in that case "much of the process was known to the defendant prior to his employment; and he did not learn about it from the plaintiff or solely by reason of his employment." 320 Mass. at 80. See *Operations Research, Inc.* v. *Davidson & Talbird, Inc.*, 241 Md. 550, 568 (1966); *Kaumagraph Co.* v. *Stampagraph Co.*, 235 N.Y. 1, 9 (1923), affirming 197 App. Div. 66, 75-76 (1921); *Saul* v. *Thalis*, 156 F.Supp. 408, 409, 412 (D.D.C. 1957). Cf. *Aronson* v. *Orlov*, 228 Mass. 1, 5 (1917); *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. at 837. As one commentator has put it: "If the employee brings to the job when he enters it extensive experience . . . courts are apt to require a higher urgency of interest on the employer's part to support a restraint. This result seems entirely appropriate, for the loss to the individual and the economic loss to society are both greatest when a highly trained and specialized person is prevented from employing his special abilities." Blake, Employee Agreements Not to Compete, 73 Harv. L. Rev. 625, 684-685 (1960).

In these circumstances, the employer has a heavy burden of isolating the secret for which he claims protection and of demonstrating that the employee is left free — questions of good faith and reasonable contract restrictions apart — to use the knowledge and skill he brought to the job as well as "what he has learned during the employment." See 2 Callmann, Unfair Competition, Trademarks and Monopolies (Callmann) § 54.2, at 415 (3d ed. 1968). "The employer's interest in the secret must be crystal clear to justify the restraint of the employee, for whom it may have become part of his general knowledge and experience." 2 Callman § 53.2(a), at 384. See *Padover* v. *Axelson*, 268 Mass. 148, 151-152 (1929); *May* v. *Angoff*, 272 Mass. 317, 320 (1930); *National Hearing Aid Centers, Inc.* v. *Avers*, 2 Mass. App.

Ct. at 292-293, and cases cited; *Cataphote Corp.* v. *Hudson,* 444 F.2d 1313, 1316-1317 (5th Cir. 1971); *Cudahy Co.* v. *American Laboratories, Inc.,* 313 F. Supp. 1339, 1344 (D. Neb. 1970); *Wheelabrator Corp.* v. *Fogle,* 317 F. Supp. 633, 637 (W.D. La. 1970).

Thus the judge to whom the original master's report had been presented, recommitted it, ordering the master to "identify[ ] the secret features of the 'structure and function of the TIRAS system,' which distinguish it from other technical management systems." But the master's "Additional Subsidiary Findings" were unresponsive; he did no more than enumerate three characteristics of the TIRAS system which he regarded as "unique." Since the plaintiff asks that the defendants be barred from providing a management information service for inertial guidance systems with these three characteristics (see note 4, *supra*), we discuss them in detail. We hold that the plaintiff did not satisfy his burden of proving that (a) two of these were secret and (b) that the third was appropriated.

The master's additional findings state, "A major and basic difference between TIRAS and other management information systems where data may be stored, retrieved and/ or reported, is that TIRAS is designed to feed back into the project activity and influence it and thus acts as a forcing function," which is performed by the project manager and, as the master found in his original report, "consists of a complete overview of a project . . . for which DRC is responsible." The plaintiff's request for injunctive relief tracks the master's phraseology, which in turn derives from the testimony of Albert Rand, manager of the Systems Division of DRC. Referring to the "forcing function" he testified: "Our specials are not just reporting the status of anything. It really does an engineering analysis of a problem and gives him options on what he can do in order to get out of it." He went on: "[T]he whole idea of TIRAS as a forcing function is to be able to try to predict and anticipate problems that are coming downstream."

Clarified by the testimony of Stauffer[12] and David Ness,[13] the plaintiff's expert, and stripped of its jargon, the master's findings come to the obvious notion that the manager of a mangement information system dealing with problems in a particular field should have some knowledge and experience in that field in order to organize the system (see note 7, *supra*) and to understand the significance of the data it yields.[14] See *Cataphote Corp.* v. *Hudson,* 444 F.2d at 1315-1316 (a trade secret "must possess at least that modicum of originality which will separate it from everyday knowledge").

Ironically, the most succinct statement of this notion is found in a paper presented in August of 1971 by one Dr. Brann, a TIRAS engineer, to the Fourth Logistics Conference and reprinted in its proceedings (the Brann paper).[15] The paper points out that DRC's projects involving inertial systems "are all run by an inertial systems engineer who can understand and be responsive to the customer's needs." This

---

[12] Stauffer testified that: "It is the manual intervention of trained engineers that makes the whole system work." The following, taken from Stauffer's deposition, was introduced in evidence: "[Q]uestion . . . 'Now, is this engineering person when we are dealing with TIRAS an important element of the TIRAS System?' Answer: 'I consider him the most important element.' Question: 'For what reason?' Answer: 'I consider that without the judgment of a mature engineer that the statistics, the numbers that can be created by a pure data file are essentially nothing more than purely numbers.'"

[13] Ness is an Associate Professor at Massachusetts Institute of Technology; he teaches largely in the area of management information systems and management information technology. He referred to "the problems that managers have in this kind of situation" as those "we would conventionally call managerial control problems". — "words [which] have really become part of the literature of management."

[14] Ness replied in the affirmative when asked, "All right. So, what my question was leading to and what I understand you to say is this; if you are looking for information about jelly beans, you have seen a management information system where the guy running the show was an expert on jelly beans?"

[15] The paper was distributed to those in attendance — about 130 persons both from the military and the aerospace industry. It was a public conference, and copies of the publication are apparently still available.

is characterized as the "basic philosophy [which] carries through all TIRAS projects." The paper also observes: "[S]elected information from one or more files are summarized, compared and analyzed by engineering personnel cognizant of the specific problem to which the results of the analysis are to be applied." The paper contrasted TIRAS with "[m]ost other information systems" which "are normally staffed by data processing personnel who lack the requisite engineering knowledge to perform meaningful engineering analyses." It is also described as "an engineering based and controlled information system which is responsive to inertial management technical information requirements." A brochure printed by the plaintiff advertises the TIRAS system as including a "PROJECT ENGINEER — Expert and experienced, the DRC project engineer coordinates and directs all activities for each TIRAS application. He represents a single, responsive point of coordination. He reviews computer reports, and generates meaningful technical analyses for customer management."

The plaintiff's request for injunctive relief also tracks the master's finding that a "unique" feature of the plaintiff's system is "the technique of pulling out and collecting a detailed life history of the object, such as a gyroscope or accelerometer." When we examine the Ness testimony from which this phraseology derives, Stauffer's and Rand's testimony regarding the collection of data, and the master's findings in this connection in his original report, we find simply the "notion"[16] of collecting (as put in the Brann paper) "a complete picture from factory to flight line,"[17] or (as put in the DRC brochure, referring to the application of TIRAS to the military) of "[p]rovid[ing] technical visibility throughout the life cycle of weapon system development

---

[16] Ness uses this word rather than the word "technique."

[17] The paper detailed the types of data the plaintiff gathers in a TIRAS project, mentioning all the major types of data collected by the plaintiff, including data as to the location, condition, operating time, and design of each instrument, reasons for the instrument's failure, and test results.

programs." Here again we find a jargonization of the obvious, which comes down to nothing more than gathering information sufficiently comprehensive to aid in the solution of whatever problems the customer wishes to be in a position to solve should they arise, limited, however, by considerations of the costs of gathering the data. Both the master's report and Ness' testimony point out that the comprehensive data gathering employed on the various projects of DRC is practical because, as the master put it, "high value equipment is involved. . . . When items are worth $10,000 and $15,000 apiece, effort is worthwhile in processing information to be able to control the process that leads to building the item."[18]

The third "unique" feature of TIRAS found by the master which the plaintiff seeks to protect by injunction is the "use of threaded lists or files." But the concept of a threaded list "is a very common concept" in computer technology,[19] although the particular structure of the data compilation (file)[20] in which threaded lists are used may be worthy of trade secret protection. See *Parker* v. *Flook*, 437 U.S. 584, 595-596 (1978); *District of Columbia* v. *Universal Computer Associates*, 465 F.2d 615, 617 (D.D.C. 1972); Bender, Trade Secret Protection of Software, 38 Geo. Wash. L. Rev. 909, 928-930 (1970). We need not decide that question. There was no evidence that Bicknell or Analytic made use of or intended to use information concerning the structure of

---

[18] This tracks Ness' testimony that "the kind of units that it deals with are very expensive ones and ones that it is worth maintaining in some sense a history on in much greater detail than would be the case with conventional manufacturers."

[19] It is so characterized by Brewster, the defendants' expert witness, whose testimony the master's finding tracks in this respect. Ness, when asked whether he had "ever heard of the concept of threaded lists" answered, "Sure." It is discussed in the literature. See Lefkovitz, File Structures for On-Line Systems (1969), passim.

[20] Ness testified that the linking of components could be accomplished "in many different ways."

the plaintiff's computer files.[21] Indeed, the evidence that Analytic contracted with General Electric for its FLEX-IMIS package of computer programs, programs not used by the plaintiff, indicates the reverse.[22]

While customers may be attracted to the plaintiff's system by the role of the TIRAS engineers and the detailed nature of the data collected, it was clearly not the secrecy of these publicized features applying obvious notions which gave the plaintiff its competitive advantage.[23] The plaintiff's capability to provide the type of service described in part 2 of this opinion derives from its ability and willingness to marshal the resources and talent necessary for this very complex task.[24] As Rand put it, "[T]he fact that we can put

---

[21] See *DiAngeles* v. *Scauzillo*, 287 Mass. 291, 297 (1934); *J.T. Healy & Son* v. *James A. Murphy & Son*, 357 Mass. at 736; *RTE Corp.* v. *Coatings, Inc.*, 84 Wis. 2d 105, 120 (1978).

[22] An employee of General Electric testified as follows: "Fleximis stands for Flexible Management Information System and it consists of a service of programs which are designed to maintain an integrated data base. There are approximately seven or eight programs. Fleximis includes the ability to make inquiries against massive amounts of data and retrieve the appropriate information that's sought."

[23] See *Richter* v. *Westab, Inc.*, 529 F.2d 896, 900 (6th Cir. 1976): "Trade secret law is designed to protect a continuing competitive advantage, which a company enjoys due to confidential information it possesses, from destruction due to disclosure by a departed former employee." See Restatement of Torts § 757 Comment b (1939): "A trade secret may consist of any . . . compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. . . . The subject matter of a trade secret must be secret." See 12 Business Organizations, Milgrim, Trade Secrets § 2.03 (1978) (Milgrim): "The value, then, of a trade secret rests in maintenance of secrecy. Not every commercial secret, however, qualifies as a trade secret. It is well known that in business most matters are considered as confidential; however, only secrets affording a demonstrable competitive advantage may be properly considered as trade secrets."

[24] The master found that "[t]he resources that would be involved, in order to design a system such as TIRAS, would include computer resources, people and availability of funds. Resources would also obviously include intellectual resources."

together this type of talent examining this total base is what made this thing really click." [25]

Essentially, the plaintiff's complaint is that Bicknell has taken his talent to Analytic and in combination with Analytic's resources and other talents is creating a capability which threatens DRC's unique position. [26] But we see no impediment to Bicknell's employment of his talents in this way. DRC is not entitled to protection of a monopoly created by its unique capability. Uniqueness without more is not commensurate with possession of a trade secret. *Laughlin Filter Corp.* v. *Bird Machine Co.*, 319 Mass. 287, 287, 290 (1946) (the court held a complaint demurrable though it alleged that the plaintiff was the only manufacturer of two types of machines, where allegations of a confidential relationship were insufficient). *Koehring Co.* v. *E.D. Etnyre & Co.*, 254 F. Supp. 334, 339 (N.D. Ill. 1966) ("a design or idea which has been made public does not become 'secret' because the manufacturer then has no competitors"). *Pressure Science, Inc.* v. *Kramer,* 413 F.Supp. 618, 626-627, 629 (D. Conn. 1976) (plaintiff was the only producer of "C-seals," not because of any secret but because no other company had been interested in penetrating the theretofore limited market). 2 Callmann § 53.3, at 390. Cf. *Junker* v. *Plummer,* 320 Mass. at 79-80; *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc.,* 372 Mass. at 839 & n.3.

Bicknell may well have enhanced his knowledge and skill through exposure, and his own contribution, to the development of TIRAS — just how much is not made clear by the master or the plaintiff whose burden it was to specify (see *Servo Corp.* v. *General Elec. Co.*, 393 F.2d 551, 556 [4th Cir. 1968]) — for he came to DRC with knowledge and experience in the field and familiarity with DRC's operation.

---

[25] He further testified: "You subdivide it into component parts and it is obvious, but very few people have been able to put together this total picture."

[26] The master found that in January, 1970, Analytic "consider[ed the] possibility of expanding its business to include management information service."

But it is just such exposure and activities which are part of the experience that enters into the knowledge and skill[27] which define a scientist or engineer. The "[p]laintiff's position is tantamount to an assertion that [Bicknell's] skill is a trade secret which it owned and continues to own despite termination of the employment relation." *Koehring Co.* v. *E.D. Etnyre & Co.*, 254 F. Supp. at 339. The guiding principle as set out in the cases and material in the beginning of part 3 of this opinion is well settled. This case is similar to *Operations Research, Inc.* v. *Davidson & Talbird, Inc.*, 241 Md. at 556-558, 567-570, in which the court refused to enjoin former employees of the plaintiff engaged in performing operations research services for governmental agencies and private industry. The court held that there was no trade secret in "the coordinated approach of skilled engineers and scientists to a particular problem,"[28] and that "Davidson and Talbird each brought to ORI their professional abilities and skills. Undeniably, they contributed to ORI's success and also benefited from their experiences with it. When they resigned, they could not reasonably be expected to blot out what they had learnt during their period of employment. . . ." See *Cudahy Co.* v. *American Laboratories, Inc.*, 313 F. Supp. at 1344-1345.

Not only "the nature of the information" but also "the conduct of the parties" (*Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. at 840) leads to the conclusion that the plaintiff is not entitled to restrain Bicknell's use of his knowledge gained while working on TIRAS. As we have seen both the role of the engineers on a TIRAS project and the detailed nature of the data collected were publicized in the Brann

---

[27] The master found that "Bicknell took with him a complete understanding and knowledge of the working principles of the DRC system known as TIRAS."

[28] Compare the findings by the master: "TIRAS consists of a large number of people, interrelationships ('interfaces'), and computer processes which yield the DRC program. A large scale TIRAS program would have functions and people with many interface relationships that had never been reduced to writing or diagram form."

paper[29] and DRC's advertising brochure.[30]  Nor is there a finding or evidence that the plaintiff "pursued an active course of conduct designed to" bring home to Bicknell or any other employee that any aspect of TIRAS was to be kept secret. *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. at 841. That case is instructive; it refused to treat as a trade secret contemplated improvements in the plaintiff's devices with which the defendant, the plaintiff's former engineer, had been involved, though it did treat as a trade secret engineering information contained in a consultant's report which the plaintiff had bought. The court described various precautions taken with reference to the consultant's report but pointed out that (applicable to this case): "As to all information, except the Foster-Miller report, the master's findings disclose no proper and reasonable steps taken by the plaintiffs to protect the secrecy of the knowledge. There was no finding that any of this information, except the contents of the Foster-Miller report, was by nature capable of being kept secret or that the knowledge was in fact confined to any restricted group of employees. There was no finding of appropriate precautions by the plaintiffs even as to contemplated improvements, except those improvements included in the Foster-Miller report." *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. at 843. *J.T. Healy & Son* v. *James A. Murphy & Son*, 357 Mass. at 738 ("We regard nonaction . . . as an insuperable reason why these processes cannot be trade secrets").

---

[29] Stauffer testified that the Brann paper was "about as complete a description [of TIRAS] as does exist."

[30] See *Wheelabrator Corp.* v. *Fogle*, 317 F. Supp. at 638-639; *Republic Systems & Programming, Inc.* v. *Computer Assistance, Inc.*, 322 F. Supp. 619, 628 (D. Conn. 1970), affirmed, 440 F.2d 996 (2d Cir. 1971); *Motorola, Inc.* v. *Fairchild Camera & Instrument Corp.*, 366 F. Supp. 1173, 1186-1187 (D. Ariz. 1973); *Condec Corp.* v. *United States*, 197 Ct. Cl. 368, 371, 375-377, 403-404 (1972); *Van Prods. Co.* v. *General Welding & Fabricating Co.*, 419 Pa. 248, 265 (1965); 2 Callmann § 53.3, at 391-393; 12 Milgrim § 2.05; 1 Nims, Unfair Competition § 146 (1947). See also *Commonwealth* v. *Robinson*, 7 Mass. App. Ct. 470, 474 n.2 (1979); *Shanahan* v. *Macco Constr. Co.*, 224 Cal. App. 2d 327, 330, 333-339 (1964).

In the circumstances of this case, the nondisclosure agreement which Bicknell signed on entering DRC's employ[31] cannot be said to have put Bicknell on notice, either when he signed it or at any time thereafter, that the obvious notions with which he was working were trade secrets. Indeed, when he openly told Anderegg and Rand that he was resigning to compete, neither of them mentioned the nondisclosure agreement though Anderegg did urge him not to compete. See *Ferranti Elec., Inc.* v. *Harwood*, 43 Misc. 2d 533, 542 (N.Y. Sup. Ct. 1964). This is a far cry from the use of purloined blueprints in *USM Corp.* v. *Marson Fastener Corp.*, 379 Mass. 90, 94-96, 99-101 (1979), in which the court pointed out various security steps in addition to the non-disclosure agreement. It seems significant to us that the court cited *Motorola, Inc.* v. *Fairchild Camera & Instrument Corp.*, 366 F. Supp. 1173, 1185-1186 (D. Ariz. 1973), as one in which the inadequate precautions did not warrant relief and none was granted, though the defendant had signed an agreement not to disclose trade secrets. "While trade secrets will be protected where a confidential relationship exists even in the absence of a contractual agreement to that effect, a contractual agreement without more does not afford such protection. It must be shown that the processes or machinery here are in fact trade secrets and that access to them was gained in confidence [footnotes omitted]." *Wheelabrator Corp.* v. *Fogle*, 317 F. Supp. at 637. *Hahn & Clay* v. *A.O. Smith Corp.*, 212 F. Supp. 22, 31 (S.D. Tex. 1962).

Such an agreement cannot make secret that which is not secret, and it remains for the court to determine whether an alleged trade secret is in fact such. *National Rejectors, Inc.*

---

[31] The contract provided in pertinent part: "I will not during my employment by DRC or thereafter at any time disclose to others or use for my own benefit any trade secrets or confidential information pertaining to any of the business of DRC or any of its clients, customers, consultants, licensees, or affiliates, acquired by me during the period of my employment, except to such an extent as may be necessary in the ordinary course of performing my particular duties of an employee of DRC."

v. *Trieman,* 409 S.W. 2d 1, 25-26 (Mo. 1966). *RTE Corp.* v. *Coatings, Inc.,* 84 Wis. 2d at 119. 2 Callmann § 53.3, at 390. 12 Milgrim § 2.03, at 2-23 n.6. See *Cataphote Corp.* v. *Hudson,* 444 F.2d at 1316.[32] Indeed, a nondisclosure agreement which seeks to restrict the employee's right to use an alleged trade secret which is not such in fact or in law is unenforceable as against public policy. *Abramson* v. *Blackman,* 340 Mass. 714, 715 (1960). *Hamilton Mfg. Co.* v. *Tubbs Mfg. Co.,* 216 F. 401, 407 (W.D. Mich. 1908). *Reynolds Metals Co.* v. *Skinner,* 166 F.2d 66, 75-76 (6th Cir.), cert. denied, 334 U.S. 858 (1948). Competitive Torts, 77 Harv. L. Rev. 888, 951 (1964). See *National Hearing Aid Centers, Inc.* v. *Avers,* 2 Mass. App. Ct. at 289, and cases cited. We conclude that any reliance on the nondisclosure agreement is misplaced, for neither the conduct of the parties nor the information sought to be covered gives content to the agreement. The nondisclosure agreement in this case can only affirm the intent of the parties to be bound by the common law of trade secrets. *Motorola, Inc.* v. *Fairchild Camera & Instrument Corp.,* 366 F. Supp. at 1185 n.3. Restatement (Second) of Agency §§ 395, 396, Comment a (1958). And this does not aid the plaintiff.

Similarly misplaced is the plaintiff's reliance on the master's further finding that Bicknell caused to be placed on the proposals submitted by DRC for TIRAS work proprietary legends,[33] and that "Bicknell and DRC both regarded TIRAS as proprietary in the sense of exclusive ownership."

---

[32] We do not accept the analysis in *Structural Dynamics Research Corp.* v. *Engineering Mechanics Research Corp.,* 401 F. Supp. 1102, 1112, 1118-1119 (E.D. Mich. 1975), cited by the plaintiff, in which the court held that two defendants "do not owe [the plaintiff] a duty not to use or disclose its trade secrets by reason of a relationship of confidence in employment" but were nevertheless bound by a general nondisclosure agreement. It is out of harmony with our cases and could turn a nondisclosure agreement into a noncompetition agreement open ended and unenforceable as against public policy.

[33] These legends read: "Proprietary Information." "Since much of the information presented herein is proprietary to Dynamics Research Corporation, we respectfully request that appropriate precautions be taken to

In context, the characterization of TIRAS as proprietary does not seem to us more than a statement of DRC's unique capability rather than an assertion that trade secrets were involved.[34] Even if these findings could be read to indicate a desire for secrecy "no duty on the part of this defendant to maintain secrecy can be implied, in the absence of other facts creating such a duty, from his knowledge that the plaintiff's officers wished the process to be kept secret or from the fact, as found by the master, 'that he agreed that secrecy was desirable for the welfare of the company on which his earnings depended, and in fact urged while he was employed by the . . . [plaintiff] that secrecy be maintained.'" *New Method Die & Cut-Out Co.* v. *Milton Bradley Co.*, 289 Mass. at 281. 12 Milgrim § 2.03. Compare *Wheelabrator Corp.* v. *Fogle*, 317 F. Supp. at 637; *National Rejectors, Inc.* v. *Trieman*, 409 S.W.2d at 25-26.

4. *Marketing information; damages.* The plaintiff's contention that it is entitled to damages points to the master's finding that Bicknell took, in addition to remembered information,[35] various documents "concerning marketing efforts by DRC" which "[o]n their face . . . appeared

preclude unnecessary disclosures and unauthorized use outside your organization."

[34] It appears that the legends were placed on proposals in which DRC sought to obtain an original contract by negotiation rather than competitive bidding. See note 11, *supra*, and accompanying text. They were not placed on proposals for follow-up contracts.

We note that the plaintiff has not shown that any of the contracts it obtained with the government contained a clause limiting the government's right to use or disclose secrets of the plaintiff, as provided since 1965 in ASPR, 32 C.F.R. §§ 9.202-2(c) and 9.203.

We also note that Bicknell initiated the restrictive legends at least seven years after the plaintiff began its TIRAS service, during which time it was not concerned to indicate that its service was in some sense "proprietary." See *Condec Corp.* v. *United States,* 197 Ct. Cl. at 371-372; *Canadian Commercial Corp.* v. *United States,* 202 Ct. Cl. 65, 77, 79 (1973); *Koehring Co.* v. *E.D. Etnyre & Co.,* 254 F. Supp. at 361; *Motorola, Inc.* v. *Fairchild Camera & Instrument Corp.,* 366 F. Supp. at 1186; 12 Milgrim § 2.05(2).

[35] The plaintiff emphasizes the evidence that Bicknell told Analytic the plaintiff's overhead figure.

to be confidential and competitively sensitive"[36] and that Bicknell took them "to refresh his recollection on DRC's sales efforts and the relative successes and failures, so that [Analytic] would benefit from such experience" — a generality which is hardly a sufficient response to the judge's order for a summary of the evidence pertaining to the defendants' use of that information. However, it is not necessary to decide whether an inference is permissible that Analytic used the information or the extent, if any, to which it was confidential so that Bicknell and Analytic are precluded from using it in competition with the plainitff. See *American Window Cleaning Co.* v. *Cohen,* 343 Mass. 195, 199 (1961) (citing *Padover* v. *Axelson,* 268 Mass. at 151; *DiAngeles* v. *Scauzillo,* 287 Mass. 291, 298-299 (1934), and Restatement (Second) of Agency § 396 and comparing *New England Overall Co.* v. *Woltmann,* 343 Mass. 69, 76-79 [1961]); *Jet Spray Cooler, Inc.* v. *Crampton,* 361 Mass. at 841, 843. Here, in spite of the fact that the parties tried "the question of dollar damages" as well as "the question of the merits of the action" at the lengthy hearing before the master, the plaintiff failed to introduce any evidence upon which the master could make an award of actual damages. Thus, in response to the direction by the judge that the master "make additional subsidiary findings showing how the damages against . . . [each defendant] were determined" and "to furnish a brief, accurate and fair summary of the evidence concerning monetary damages," the master vacated his previous finding of damages and recommended a further hearing on that question, thus finding in effect that, absent such a hearing, an award of actual damages was not justified. See note 2, *supra,* and related text.

From the plaintiff's affidavit in aid of its motion for a new hearing on damages, it appears that the only figures it presented at the hearing were its marketing budget during 1971, indirect expenses for 1966-1971, its billing rate, and

---

[36] One of the documents listed is a DRC news release relating to the award of a contract in the Minuteman program.

that it expended $12,629 for labor on the SRAM effort and $4,663 for travel. We find nothing, in the brief or in the affidavit, which attempts to analyze these figures so as to make possible a finding of damages on any of the theories discussed in *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 169-171, 174-177, 183 n.22 (1979).[37] Thus, the judge acted within his discretion in refusing to order a further hearing on the question of damages. We see no "special circumstances present here which support granting the plaintiff a further opportunity to present his claim." *Strong* v. *Merchants Mut. Ins. Co.*, 366 Mass. 751, 753 (1975). *Marshall* v. *Holbrook*, 276 Mass. 341, 348 (1931). *Entrialgo* v. *Twin City Dodge, Inc.*, 368 Mass. 812, 813 (1975).

5. *Conclusion.* Accordingly, we do not disturb the judgment dismissing the action although our decision rests upon somewhat different grounds from those of the Superior Court. *E. Whitehead, Inc.* v. *Gallo*, 357 Mass. 215, 219 (1970).

*Judgment affirmed.*

---

[37] The only figures which on their face may be directly relevant were the SRAM expenses; but the master found specifically in his original report that the plaintiff was not entitled to damages on account of the SRAM activity, a finding which was not contested. The plaintiff eventually obtained a contract to perform its service for SRAM — indeed the only contract, from what appears, for which the plaintiff and Analytic competed.