Brassard, J.
This matter is before the court on the request of plaintiff State Street Corporation (“State Street”) to enforce non-compete, non-disclosure and non-solicitation agreements against three of its former employees, defendants Dean S. Barr (“Barr”), Joshua Feuerman (“Feuerman”) and Richard Goldman (“Goldman”) (collectively, “defendants”). State Street seeks an order enjoining the defendants from working for Bankers’ Trust Company (BT)[2] for eighteen months, and enjoining the defendants from breaching non-disclosure and non-solicitation agreements they signed with State Street. Specifically, State Street seeks to enjoin defendants, for eighteen months, from contacting, soliciting, and inducing business from, clients of State Street; from soliciting certain State Street employees to terminate their employment with State Street; and from using, at any time, confidential or trade secret information obtained through their employment at State Street. Defendants argue that their agreements with State Street allow them to work for BT, that the non-solicitation agreements are void for lack of consideration, and that the alleged violations of the non-disclosure agreements do not include trade secrets or protected confidential information.
In addition, BT moves to intervene.
For the following reasons, State Street’s motion is ALLOWED in part and DENIED in part. BT’s motion is ALLOWED.
BACKGROUND
State Street is a financial institution that provides a variety of commercial and consumer financial services. State Street Global Advisers (“SSgA”) is an asset management division of State Street. The defendants were employed as principals of SSgA until September 1, 1999, when defendants resigned from State Street to work for BT, another asset management firm. Barr had been employed by SSgA since 1997; Feuerman since 1991; and Goldman since 1993.
At the time State Street employed Barr, it purchased 62% of his stock in Advanced Investment Technology (“AIT”), an investment advisory firm of *600 which Barr was the chief executive officer, for approximately $1.2 million. State Street subsequently purchased the remainder of Barr’s stock for $800,000 in July of 1999. State Street also bought the rights to Statistical Process Control (“SPC”), a quantitative investment tool that Barr had developed to analyze the investment strategies of individual clients.
As a senior executive in SSgA’s Active Quantitative Strategies Department, Barr supervised approximately 45 investment advisors who collectively managed approximately $37.6 billion in assets. Barr was also responsible for oversight of SSgA’s Advanced Research Center (“ARC”), which coordinated SSgA’s research activities and developed confidential codes and mathematical formulas for its different investment strategies. As a principal in SSgA’s Corporate Defined Benefit Sales, Goldman supervised a sales staff of ten, and was responsible for introducing and selling new products to some of SSgA’s largest corporate clients. Feuerman was a principal in SSgA’s Active International Quantitative Strategies Group, which managed approximately $6.2 billion in assets. Feuer-man was also the portfolio manager for the SSgA Emerging Markets Fund, which has been ranked as the single best emerging markets fund for the last five years.
On or about July 13, 1998, Barr and State Street executed a stock award agreement (“Award Agreement”) and a change of control agreement (“Control Agreement”). On or about October 18, 1998, Barr and State Street also executed a Long Term Incentive Plan Agreement (“Incentive Plan”) (collectively, “Agreements”). Feuerman executed an Award Agreement and Control Agreement on or about September 18, 1997, and an Incentive Plan on or about October 16, 1998. Goldman executed an Award Agreement and Control Agreement on or about July 13, 1998, and an Incentive Plan on or about October 20, 1998.
The Agreements granted defendants benefits (the “awards”) that would vest if defendants remained with the company for a specified period of time. Each of the Award Agreements and Control Agreements signed by defendants contained covenants not to compete, not to solicit State Street principals or clients, and not to disclose State Street trade secrets or other confidential information.
The non-compete covenants provided, in part, that
for a period of eighteen (18) months following termination of employment for any reason, . . . (defendant) shall not engage ... in any manner or capacity as advisor, principal, agent, partner, officer, director or employee of any of the Top Five (5) (as defined below) institutions, or their subsidiaries.
The non-compete covenants define “Top Five” institutions as “the five institutions with the highest value of total assets under management as listed in the most recent annual rankings of either Institutional Investor or Pensions & Investments magazine,” not including State Street or its subsidiaries. There is a major dispute in this action as to whether BT qualifies as one of the “Top Five” under the criteria stated in the non-compete covenants.
The non-solicitation covenants required defendants to refrain, for eighteen (18) months after the termination of employment, from soliciting the employment of any officer or person of comparable position at State Street, and from soliciting business from any client of State Street on behalf of any person or entity other than State Street.
In addition, the Award Agreements and Control Agreements required defendants to hold in a fiduciary capacity all secret or confidential information, knowledge or data obtained as a result of their employment with State Street.
On September 1, 1999, the defendants resigned from State Street to work for BT. State Street brought this action to enforce the aforementioned covenants.
DISCUSSION
In considering whether to grant a preliminary injunction, the court conducts a balancing test, evaluating the moving party’s claim of injury together with its chance of success on the merits. Packaging Industries Group v. Cheney, 380 Mass. 609, 617 (1980). Thereafter, if the court finds that the failure to issue the injunction would “subject the 'moving party to a risk of (irreparable) harm in light of the party’s chance of success on the merits,” the court will weigh that risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party. Id. Only when the balance between the risks cuts in favor of the moving parly may a preliminary injunction properly be issued. Id. ; Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 710 (1990).
A. Forfeiture for Competition Does Not Apply
Defendants claim that they are not bound to any of the provisions in the Agreements because the covenants would apply only if their interest in the awards had vested. They argue that, by leaving State Street, they have given up their right to have the awards vest, and are therefore not bound by the covenants in the Agreements. Essentially, defendants argue that the covenants constitute forfeitures for competition rather than traditional covenants not to compete. See Kroeger v. Stop & Shop Companies, 13 Mass.App.Ct. 310 (1982). See also Kamenstein v. Jordan Marsh Co. et al, 623 F.Supp. 1109 (D.C. Mass. 1985).
In a forfeiture for competition scenario, an employee agrees to forego money or benefits he has already earned if he goes into competition with his employer. In Kroeger, where an employee requested deferred compensation in return for an agreement not to compete, the Appeals Court pointed out that “forfeitures of deferred compensation present a different *601 problem from the usual postemployment restraint cases in that the question is not whether the employee may follow the occupation he knows, but what price in dollars he shall pay for so doing.” Id. at 319. See also Kamenstein v. Jordan Marsh Co. et al, 623 F. Supp. 1109 (D.C.Mass. 1985) (under plan for deferred payment of bonus compensation, executive employee forfeited payments upon taking employment with competitor).
In this case, where the defendants’ awards would not vest for several years, the employees were not deferring payment of money they had already earned. The defendants did not contract to pay a price in dollars for leaving the company. Rather, State Street promised that if a principal remained with State Street for a certain period of time, his awards would vest.[2] In return for the promise to receive benefits in the future, the principal agreed not to compete, solicit or reveal trade secrets if he did decide to leave the company before the awards vested.
Where these defendants paid no price in dollars for leaving the company, State Street is likely to succeed on its claim that the covenants in the Agreements may be enforced if they are reasonable in scope and time and are no greater than necessary to protect State Street’s legitimate business interests. See Kroeger v. Stop & Shop, supra, at 316.
B. Non-Compete Agreements
At this early stage in the proceedings, State Street does not appear to have a substantial likelihood of success on its claim that the defendants violated the non-compete covenants in their Agreements. The Agreements state that the named individual agrees not to compete “. . . as advisor, principal, agent, partner, officer, director or employee of any of the Top Five institutions (’Top Five’).” The Agreements define the Top-Five as
the five institutions with the highest value of total assets under management as listed on the most recent annual rankings of either Institutional Investor or Pensions and Investments magazine . . . and shall not include [State Street] or its subsidiaries and divisions.
The Agreements further provide that if “for any reason the publications used to determine the Top Five have different rankings, then any institution listed in the Top Five list of any such publication will be considered an institution in the Top Five.”
The parties sharply dispute whether BT qualifies as a Top Five institution according to the above definition. In asserting that BT is not within the Top Five, BT relies upon the July 1999 issue of Institutional Investor, which ranks BT as Number 7, and the August 1999 issue of Pensions and Investments, which lists BT as Number 13. State Street responds that the August 1999 ranking of Pensions and Investments is inapplicable because it is not the annual ranking specified by the Agreements. State Street contends that the correct annual rankings appear only in the May 1999 issue of Pensions and Investments, which ranks BT as Number Six. By eliminating SSgA, which was ranked Number Three, State Street argues that this list places BT in the Top Five.
The news article accompanying the May 17, 1999 rankings in Pensions and Investments references “the results of Pensions and Investments' annual money manager survey.” The news article accompanying the August 9, 1999 rankings in Pensions and Investments references “the annual survey by Pensions and Investments and Watson Wyatt Worldwide.” State Street has not presented persuasive evidence to support its contention that the list in the May 1999 issue is the pertinent annual ranking. BT points out that the August ranking is more recent than the May ranking and further asserts that BT relied on the July and August 1999 listings as the most recent rankings when it made offers of employment to the defendants.
Ordinarily the language of an agreement must be fairly and reasonably construed to ascertain the intent of the parties. See Computer Systems of America v. Western Reserve Life Assurance Co., 19 Mass. App. 430, 4s. App. 943 (1993). Any ambiguities are resolved against the party which drafted the agreement. See Canam Steel Corp. v. Bowdoin Const. Co., 34 Mass.App. 943 (1993). In this case, the material before the court indicates that the term “most recent annual ranking” is ambiguous. The court must consider, therefore, whether the non-drafting parties’ interpretation of the phrase is reasonable and practical. See Affiliated FM Ins. Co. v. Constitution Reinsurance Corp., 416 Mass. 839 (1994). In the absence of any precise statement in the Agreements as to which monthly rankings are to be considered the applicable annual listings, defendants’ reliance on the most recent issues of the two publications is both reasonable and practical.
Because State Street has failed to show a likelihood of success on the merits, it is not entitled to an injunction prohibiting the defendants from working for BT.
C. Non-Solicitation of State Street Principals
The Award Agreement states, in relevant part, that during the non-competition period (18 months sifter the termination date), the employee “shall not . . . solicit, directly or indirectly . .. the employment of any person who within the previous 12 months was an officer of, or held a position of comparable responsibilities with, the Corporation or any of its subsidiaries.”
In its claims against each of the defendants for violation of covenants not to solicit other State Street principals, State Street has demonstrated a likelihood of success on the merits. State Street has submitted several affidavits in support of its contention that the *602 defendants engaged in conversations that might reasonably be interpreted as attempts to induce other State Street principals to leave State Street to work for BT.
Affidavits from State Street principals Paul Brakke, Peter Leahy and Michael Mondo indicate that Goldman spoke with State Street managers regarding employment opportunities with BT both before and after his departure from State Street. Likewise, affidavits from Kenneth Swann and Paul Brakke assert that Barr spoke to them about employment opportunities with BT. Brakke also asserts that Feuerman encouraged him to explore employment opportunities with BT.
The affidavits filed by the defendants do not deny that such contacts occurred. Goldman acknowledges making calls to Brakke, Leahy and Mondo, but asserts that he did so only “as a courtesy” to inform them that a headhunter for BT might be in contact with them. Barr acknowledges that some State Street principals called him after they had been contacted by BT’s headhunter. Barr states, however that he did not encourage these individuals to leave State Street; he merely discussed his opinion as to why BT was a good move for him. Feuerman does not confirm or deny that he spoke with Brakke, but states that he believes that Brakke’s affidavit contains numerous misleading and erroneous statements.
Where there is evidence supporting State Street’s allegation that the defendants violated the non-solicitation agreements by encouraging, directly or indirectly, other State Street principals to seek employment with BT, State Street has a likelihood of prevailing on this claim. Moreover, while State Street would likely be harmed by a major defection of principals to another investment management firm, there is no evidence that the defendants will be harmed if they are enjoined from violating their agreements not to solicit certain State Street employees.
D. Non-Solicitation of Clients
The Award Agreement states, in relevant part, that during the non-competition period, the Executive “shall not . . . engage in the solicitation of business from any client on behalf of any person or entity other than the Corporation.” The Agreement defines “solicitation of business” as “the attempt through direct personal contact (including by correspondence, telephone or other means of communication) . . . with a client... to induce such client to transfer its business relationship from the Corporation ... to any other person or entity.”
State Street has demonstrated a likelihood of success on its claim that Goldman attempted to induce State Street clients to transfer their business to BT. Affidavits from two State Street employees state that Goldman discussed his departure from State Street with two of State Street’s contact people at Philip Morris, Mark Werner (“Werner”) and John Long (“Long”). Penny Darcey, a Senior Client Service Advisor for State Street, states that Werner told her on September 7, 1999, that he and Goldman had discussed whether SSgA would be able to continue handling the Philip Morris account after Goldman’s departure. Werner also reportedly told Darcey that Goldman had discussed the details of his departure from SSgA with Long. In addition, Christopher Pope, SSgA’s Director of Client Services, states that Werner told him on September 2, 1999 that Goldman had said he was going to BT and would “be in touch soon.”
Goldman does not deny that these conversations took place. He states in an affidavit that he talked to Werner before his resignation, and that he had a telephone conversation with Long on September 7, 1997. He contends, however, that such contacts were only a “courtesy,” and were not intended to lure State Street clients to BT.
Darcey also states that she was told by James H. Rich DI, the senior investment strategist for IBM’s retirement funds, that Goldman had contacted him to tell him he was leaving State Street and to suggest that “maybe our paths will cross in the future.” Goldman acknowledges making this call also, but states that Darcey’s affidavit does not demonstrate that Goldman tried to persuade Rich to move IBM’s business from State Street to BT. Goldman also acknowledges that, as a courtesy, he called James Boyle of ManuLife to tell him that he was no longer with SSgA, but states that when Boyle asked him what he should do with the information, Goldman replied “I can’t tell you that.”
Against the backdrop of an explicit covenant not to solicit clients in a highly competitive field, there is a fine line between courtesy and subtle solicitation. Because Goldman acknowledges that he had direct personal contact with State Street clients both immediately before and after his departure from State Street, and that he discussed with those clients his move to BT, State Street has a reasonable likelihood of success on its claim that Goldman violated his covenant not to solicit clients.
State Street has not presented evidence that Feuer-man or Barr had personal contacts with clients regarding their departures from SSgA.
E. Trade Secrets
State Street seeks to enjoin the defendants from disclosing confidential SSgA information and/or trade secrets obtained during their employment. The Agreements required defendants to “hold in a fiduciary capacity for the benefit of [State Street] all secret and confidential information, knowledge or data” which they obtained during their employment.
If an employer wishes to retain the exclusive use of a trade secret in business, he “must not fail to take all proper and reasonable steps to keep it secret.” See J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 738 (1970). State Street argues that it took *603 reasonable steps to protect trade secrets, including the identity of clients, products, costs, sales, profit margins, projections, investment and business strategies, and marketing plans. General business information is generally not protectible as confidential. See Augat, Inc. v. Aegis, Inc., 409 Mass.165, 169 (1991). Moreover, defendant’s claim that they were never told to keep any information confidential. They argue that, on the contrary, they were encouraged to disclose information to potential clients because the intelligence and sophistication of their institutional investors required them to be forthcoming about State Street’s products and programs, including the system of financial modeling they employed to develop specific investment strategies. Goldman’s affidavit contains several exhibits in support of his argument that State Street has previously published information that it now claims to be confidential. In addition, defendants contend that State Street’s responses to potential clients’ requests for proposals contain detailed information regarding the firm’s investment strategies.
In order to enforce an agreement not to reveal trade secrets, a court must determine whether the employer took reasonable measures to preserve the secrecy of its information. USM Corp. v. Marson Fastener Corp. John Serhant, the Chairman of State Street’s Investment Committee, states that Barr’s oversight of the ARC provided him with access to confidential information regarding SSgA’s investment strategies for individual corporate clients. SPC, for example, provides each SSgA client with a confidential quantitative evaluation of the historic investment performance of its pension plan returns. Since most large pension plans utilize investment managers from different firms, SPC evaluates the historical performance of an individual plan to evaluate the probabilities of future success by altering the mix of investment managers and strategies.
When it hired Barr, State Street also received the rights to a pending patent for SPC that has since been granted. State Street argues that this patent affords additional trade secret protection. A process that has been patented, however, “may not be considered a ‘trade secret’ because a trade secret, by definition, has not been placed in the public domain.” See Kewanee Oil Co. v. Bicron Corp, 416 S. 470, 484 (1974) (process which has been patented may not be considered trade secret because patent laws require that the patent application “include a full and clear description of the invention and the manner and process” of using it). Id. at 481.
Barr contends that the SPC merely analyzes public domain information about investment managers and strategies to optimize investment return for a client. He also asserts that the ARC was merely a marketing tool, and as such did not create secret or confidential information.
Although Serhant asserts that State Street actively engaged in conduct to protect the confidential work and processes related to SPC and ARC, he fails to identify any measures State Street took to protect this information, other than requiring certain employees to sign non-disclosure agreements. A non-disclosure agreement alone is not sufficient to create trade secret protection. See Dynamics Research Corp. v. Analytic Sciences Corp., 9 Mass.App.Ct. 254, 111 (1980). “It must be shown that the processes . .. are in fact trade secrets and that access to them was gained in confidence.” Id. At 277. The non-disclosure agreement should identify the particular processes or information sought to be protected. Id.
In this case, the non-disclosure agreement did not identify either the ARC or SPC as trade secrets. Moreover, State Street did not identify the SPC as a significant technological achievement in the Form 10-K it filed with the Securities and Exchange Commission for the year ending December 31, 1998, and has presented no other evidence that it considered either the SPC or ARC a trade secret.
Barr asserts that since 1984 he has been in the business of using historical data, the laws of probability and his own knowledge of investment markets to create investment models and programs. Consequently, he argues, his ability to develop probability-based investment strategies does not involve the disclosure of any information he acquired at State Street.
An employer may not assert that an employee’s skill is a “trade secret which it owned and continued to own despite termination of the employment relation.” See Dynamics Research Corp. v. Analytic Sciences Corp., 9 Mass.App.Ct. 254, 275 (1980). In order to succeed on its claim that the defendants violated their covenants not to disclose trade secrets, State Street must show that the defendants’ knowledge of the SPC and ARC included confidential information, and that State Street pursued a “consistent course of action” to inform and remind employees that such information was confidential and to be protected from disclosure. Id. Because State Street has not presented such evidence, State Street is not entitled to injunctive relief on its claim that defendants violated their non-disclosure agreements.
F. BT’s Right to Intervene
In assessing the right to intervene, Massachusetts courts compare “the interests of the would-be intervenor in having a prompt resolution of the problem, to the interests of the initial parties in maintaining a simpler and quicker trial, and to the interests of the court in efficiently managing its docket." See Mayflower Development Corp. v. Town of Dennis, 11 Mass.App.Ct. 630, 635-36 (1981). Upon timely application, anyone may intervene in an action when
*604 the applicant claims an interest relating to . . . the subject of the action and [the applicant] is so situated that the disposition of the action may as a practical matter impair or impede [the applicant’s] ability to protect that interest, unless the applicant’s interest is adequately represented by existing parties.
Mass.R.Civ.P. 24(a). Because State Street is challenging the defendants’ rights to continue working for BT, BT risks losing the services of a group of employees for whom it incurred recruitment costs in excess of $2 million. Further, in light of BT’s contention that it relied on the definition of “Top Five” in State Street’s Agreements with the defendants in offering them employment, it is appropriate for BT to be included in these proceedings. The defendants’ interests in their individual employment situations do not necessarily coincide with BT’s business interests. Accordingly, BT may intervene in this action.
ORDER
For the foregoing reasons, it is hereby ORDERED that
The defendants are ENJOINED, until February 28, 2001, from soliciting, directly or indirectly, the employment of any person who within the previous 12 months was an officer of, or held a position of comparable responsibilities with State Street or any of its subsidiaries. Defendant Goldman is further ENJOINED, until February 28, 2001, from engaging in the solicitation of any business from any client of State Street or its subsidiaries.
The balance of the requested injunctive relief is DENIED.
The motion of BT to intervene is ALLOWED.

 The question of what would happen if the employee's awards had already vested is not before this court.